USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/24/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------- X
:
OSCAR LEONEL GARCIA, :
:
:
Petitioner, : 20-cv-1345 (LJL)
-v- :
: OPINION & ORDER
THOMAS DECKER, *in his official capacity as Field* :
*Office Director, New York City Field Office, U.S.* :
*Immigration and Customs Enforcement*, :
:
CHAD WOLF, *in his official capacity as Acting* :
*Secretary of the U.S. Department of Homeland Security*, :
:
WILLIAM BARR, *in his official capacity as Attorney* :
*General, U.S. Department of Justice*, :
:
Respondents. :
:
---------------------------------------------------------------- X

LEWIS J. LIMAN, United States District Judge:

    Oscar Leonel Garcia ("Petitioner" or "Mr. Garcia") brings this petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2241, the All Writs Act, 28 U.S.C. § 1651, and Article I, Section 9, of the Constitution of the United States. He asserts that he is being held unconstitutionally in the custody of the United States because, at the bond hearing held pursuant to 8 U.S.C. § 1226(a), the Government was not required to show that Mr. Garcia posed either a risk of flight or a danger to the community. For the following reasons, the petition is granted.

**BACKGROUND**

    The following facts are taken from the petition before the Court and supporting materials. Mr. Garcia has lived in the New York area for over a decade. He has an eighteen-month-old

1

daughter who is a U.S. citizen.  Mr. Garcia himself is a native and citizen of Guatemala.  Mr. Garcia's entire criminal record consists of a sole non-criminal conviction for disorderly conduct.  On June 1, 2019, he was arrested in Rockland County, New York.  He was charged with two domestic violence misdemeanors stemming from allegations made by Mr. Garcia's former partner, the mother of his child.  Following Mr. Garcia's arraignment, the criminal court released him on his own recognizance.  Throughout this time, Mr. Garcia maintained his innocence as to the accusations underlying the criminal charges.  On January 7, 2020, in exchange for dismissal of the misdemeanor charges, Mr. Garcia pleaded guilty in the Rockland County Court to disorderly conduct, a violation—not a crime.  *See* N.Y. Penal Law § 240.20 ("Disorderly conduct is a violation."); *id.* at § 10.00 ("'Crime' means a misdemeanor or a felony.").  There was never any finding or adjudication that Mr. Garcia engaged in any of the alleged conduct (or indeed any violent or dangerous conduct).  He was sentenced to a one-year conditional discharge, and a two-year order of protection was entered against him.

While the criminal case had been pending, Rockland County's Integrated Domestic Violence ("IDV") court placed Mr. Garcia's daughter in the custody of her mother but granted Mr. Garcia weekly supervised visits with his daughter.  According to a letter from a supervisor of the visitation program, Mr. Garcia was "[r]espectful to the staff, committed to his time, [and] loving and caring to his daughter."  Mr. Garcia, "at each [visit] brought diapers, wipes, cloth, toys, and snacks for [his daughter]."  Overall, the supervisor "saw a caring, loving and family-oriented person."

On August 28, 2019, while the criminal charges were pending, ICE issued an administrative warrant of arrest for Mr. Garcia.  On November 19, 2019, as Mr. Garcia approached the entrance to the Rockland County Courthouse for an appearance in his criminal

2

case, ICE agents arrested and detained him for purposes of placing him in removal proceedings. On November 22, 2019, ICE served a Notice to Appear, charging Mr. Garcia as removable. At a hearing on December 10, 2019, Mr. Garcia, through counsel, indicated that he would seek to terminate proceedings based on his allegedly unlawful arrest outside the courthouse. On January 14, 2020, Mr. Garcia's counsel filed a written motion to terminate removal proceedings, or in the alternative, to suppress and exclude evidence recovered during the arrest.

The bond hearing relevant to this appeal took place on January 28, 2020, four months after Mr. Garcia was first placed in detention. In advance of that hearing, Mr. Garcia submitted, through counsel, over 150 pages of evidence in support of his request for bond. His papers emphasized that his sole arrest had been resolved with a plea to a disorderly conduct violation.[1] The Government submitted no evidence. Ultimately, the Immigration Judge denied bond. Crucially, the Immigration Judge reached that determination after placing the burden on Mr. Garcia to prove that he did *not* present a danger to the community or a flight risk, thereby relieving the Government of any burden.[2]

On February 26, 2020, Mr. Garcia filed a motion for a bond redetermination hearing, alleging changed circumstances. A bond redetermination hearing was scheduled before an Immigration Judge for March 19, 2020. Mr. Garcia has been detained from November 19, 2019 through the present. The IDV court has indicated that it would grant Mr. Garcia continued supervised visitation with his daughter, as well as phone calls with her, but only upon Mr. Garcia's release from ICE custody.

---

[1] To be clear, Mr. Garcia has consistently opposed his removability and his detention.

[2] At the time of the bond hearing, an Immigration Judge had yet to determine Mr. Garcia's removability. On February 6, 2020, however, an Immigration Judge issued an oral decision denying Mr. Garcia's motion to terminate immigration proceedings and finding that ICE had met its burden of establishing Mr. Garcia's removability. Mr. Garcia, through counsel, indicated he would seek relief in the form of cancellation of removal. On February 20, 2020, Mr. Garcia filed his application for relief from removal. The Immigration Judge set a merits hearing on Mr. Garcia's application for April 2, 2020.

This Court heard oral argument, on the record and via teleconference, on the petition on March 13, 2020. That same day, the Court orally granted the petition and ordered that Mr. Garcia be given a hearing by ICE at which the Government would have to prove by clear and convincing evidence that Mr. Garcia posed either a risk of flight or a danger to the community. The Court further ordered that he be released if he were not given that hearing within seven days. And the Court explained its reasoning. Shortly thereafter, the Court issued a short written order. This opinion explains the Court's decision in greater detail.

## DISCUSSION

### 1. Jurisdiction and Venue

The Government does not dispute that this Court has jurisdiction and that venue properly lies in the Southern District of New York. The Court has subject matter jurisdiction under at least 28 U.S.C. §§ 1331 and 2241; Article I, Section 9, Clause 2 of the Constitution; and the All Writs Act, 28 U.S.C. § 1651. Venue properly lies in the Southern District of New York under 28 U.S.C. § 2241. At the time of the filing of the petition, Mr. Garcia was detained at the Orange County Correctional Facility in Goshen, New York, which is within this District. In addition, Respondent Decker is located within this District and, as Director of the ICE NY Field Office, has control over Petitioner's detention. *See Cruz v. Decker*, 2019 WL 6318627, at *6 (S.D.N.Y. Nov. 26, 2019); *Rodriguez Sanchez v. Decker*, 2019 WL 3840977, at *2 (S.D.N.Y. Aug. 15, 2019).

### 2. Due Process Violation

Mr. Garcia claims that his continued detention at the Orange County Correctional Facility violates the Constitution, and specifically the Due Process Clause of the Fifth Amendment,

because the Government has never been required to prove that he presents either a risk of flight or a danger to the community. The Court agrees.

Numerous courts in this District have determined that a violation of the Due Process Clause occurs when the Government detains a person suspected of being removable from the United States without demonstrating at a Section 1226(a) bond hearing that he or she does not pose a risk of flight or a danger to the community. This Court agrees that the Government bears the burden of making such showing and by clear and convincing evidence. *See Velasco Lopez v. Decker*, 2019 WL 2655806, at *3 (S.D.N.Y. May 15, 2019) ("Every court to have considered to have considered the constitutional issue . . . has agreed [that] under the Due Process Clause of the Fifth Amendment, it is the government's burden to justify the detention of an immigrant at a bond hearing under § 1226(a)."); *see also Linares Martinez v. Decker*, 2018 WL 5023946, at *3 (S.D.N.Y. Oct. 17, 2019) (collecting cases). The United States Court of Appeals for the Ninth Circuit has reached the same conclusion. *See Singh v. Holder*, 638 F.3d 1196, 1205 (9th Cir. 2011).

The Court is persuaded by the reasoning underlying that precedent. Under the Due Process Clause of the Fifth Amendment, "[n]o person shall . . . be deprived of . . . liberty . . . without due process of law." U.S. Const. amend. V. The liberty guaranteed by that clause does not extend to United States citizens alone. Both the language of the Constitution and the caselaw under it establish that the protection extends to all persons, including persons whom the Government alleges to be non-citizens and to be removable. It is also established that the protection afforded by the Due Process Clause includes the right to receive a full and fair hearing that provides a meaningful opportunity to be heard before one's liberty is taken away. *Zuniga-Perez v. Sessions*, 897 F.3d 114, 122 (2d. Cir. 2018) (citing *Reno v. Flores*, 507 U.S. 292, 306

5

(1993)); *see Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("[T]he Due Process clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent."). Indeed, the Supreme Court has repeatedly reaffirmed that freedom from civil detention is a core tenet of constitutional due process. *See Addington v. Texas*, 441 U.S. 418, 425 (1979) ("This Court repeatedly has recognized that civil commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection."); *see also Zadvydas*, 533 U.S. at 690 ("Freedom from imprisonment–from government custody, detention, or other forms of physical restraint–lies at the heart of the liberty [the Due Process Clause] protects."); *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992) ("Freedom from bodily restraint has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action.").

Thus, courts have concluded that balancing the Government's recognized interest in "ensuring the appearance of aliens at future immigration proceedings," *Zadvydas*, 533 U.S. at 690, against the weighty constitutional interest in freedom from civil detainment, "supports imposing the greater risk of error on the Government [in a Section 1226(a) bond hearing] – specifically, by allocating to it the burden of proof," *Linares Martinez*, 2018 WL 5023946, at *3. The reasons supporting this consensus view are multiple, have been persuasively articulated elsewhere, and need not be repeated here. *See id.* (discussing the equities, the proper allocation of the risk of error to the Government, the proper burden on the Government as the party seeking the Court's intervention, and the better position of the Government to gather and present evidence); *see also Darko v. Sessions*, 342 F. Supp. 3d 429, 434–35 (S.D.N.Y. 2018). Two points, however, bear elaboration.

First, the deprivation of due process here is particularly egregious. Mr. Garcia is being held on an administrative warrant pursuant to Section 1226(a). In contrast to its counterpart, Section 1226(c), which permits the Government to detain only "a limited class of deportable aliens" who have prior serious or criminal convictions (for "aggravated" felonies), *cf. Demore v. Kim*, 538 U.S. 510, 518 (2003), Section 1226(a) is of extraordinary breadth. It permits the Attorney General—or, in practice, a single immigration officer acting as a delegate of the Attorney General—to arrest literally any person in the United States whom he suspects not to be a citizen and to be removable, whether or not that person in fact is a citizen of the United States or in fact is lawfully present in the United States. Under both the statute and the governing regulations, a single immigration officer can issue an administrative warrant to arrest and detain any person suspected to be an "alien . . . to be removed from the United States," without even any prior or subsequent probable cause hearing. *See* 8 C.F.R. § 236.1(b) ("A warrant of arrest may be issued only by those immigration officers listed in § 287.5(e)(2) of this chapter."); 8 C.F.R. § 287.5(e)(2) (listing 53 categories of officials authorized to issue warrants). Moreover, because under the regulations the bond hearing proceeds independently of the removal proceedings (at which the burden is properly placed on the Government to prove removability by clear and convincing evidence),[3] the consequence of the Government's position is to permit it to hold a person without any showing at a bond hearing that he or she is not a citizen and is removable.[4]

---

[3] *See* 8 C.F.R. § 1003.19(d) ("Consideration by the Immigration Judge of an application or request of a respondent regarding custody or bond shall be separate and apart from, and shall form no part of, any deportation and removal proceeding.").
[4] After a final order of deportation has been entered, an alien is subject to the *Zadvydas* regime. *See Zadvydas*, 533 U.S. at 701.

7

Indeed, that is precisely what happened here. Although the Government claims that Mr. Garcia is "a deportable alien" and therefore, it implies, he is presumably entitled to fewer rights than someone not deportable, at the time of Mr. Garcia's bond hearing no judicial officer found he was removable and even today he is seeking cancellation of removal. Under the Government's argument, even if a detainee under Section 1226(a) denies that she is deportable or, as was the case with Petitioner in this case, remains silent, she can still be detained for months before the merits of her detention are heard.

That proposition is breathtaking. It deviates grossly from the Supreme Court precedent that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). In the criminal context, in *Salerno*, the Supreme Court held that after a judicial officer has found probable cause to believe that someone has committed a serious crime, that person can be held in pretrial detention only if the Government bears the burden of proving dangerousness and flight risk, *id.* at 750[5], and as laid out below, only if the person is arraigned and given a bail hearing shortly after arrest. *Id.* at 747; *see Cty. of Riverside v. McLaughlin*, 500 U.S. 44, 47 (1991). Even then, the Supreme Court emphasized that Congress had made specific findings of dangerousness as to the group subject to detention, and the detention provision was upheld in part because "[t]he Act operates only on individuals who have been arrested for a specific category of extremely serious offenses . . . [and] Congress specifically found that these individuals are far more likely to be responsible for dangerous acts in the community after arrest." *Salerno*, 481 U.S. at 750.

---

[5] On this basis, the Court was assured that "the Act [was not] by any means a scattershot attempt to incarcerate those who are merely suspected of these serious crimes." *Id*.

In *Demore v. Kim*, the Supreme Court affirmed the mandatory detention of certain persons in immigration detention, but that statute was limited to convicted criminals facing deportation under Section 1226(c).[6] 538 U.S. at 518, 531. The Supreme Court emphasized that Congress had made specific findings about the dangerousness and flight risk of the *limited* class of aliens subject to the statute. *Id*. at 518 ("Section 1226(c) mandates detention during removal proceedings for a limited class of deportable aliens—including those convicted of an aggravated felony"). The Court described at length the Congressional findings supporting detention for this limited group. *Id.* at 518–21.

Section 1226(a), in contrast, applies to a broad swath of persons, including "ordinary visa violators" and persons who claim that they are United States citizens or deny they are in the United States unlawfully. *Linares Martinez*, 2018 WL 5023946, at *4 (quoting *Zadvydas*, 533 U.S. at 697). Congress has not found all persons subject to Section 1226(a) to be presumptively dangerous or a flight risk. Nor are there any legislative findings reflecting a determination to give the Attorney General or an immigration officer the sweeping power to arrest and detain any person suspected to be removable without bearing any burden to show flight risk or dangerousness. *Contra Demore*, 538 U.S. at 518; *Salerno*, 481 U.S. at 755. In these circumstances, Mr. Garcia's continued detention is intolerable and violative of the Fifth Amendment.

Second, the Court rejects the Government's argument that it is relieved of any burden to prove dangerousness or risk of flight (by any standard) because "an alien may voluntarily end removal proceedings and the immigration detention incident to them" and because the duration

---

[6] Section 1226(c) gives the Attorney General the authority to take into custody aliens who are inadmissible or deportable by reason of having committed one or another of a list of offenses, including crimes of "moral turpitude," crimes relating to a controlled substance, aggravated felony, or terrorist activities. *See* 8 U.S.C. § 1182(a)(2), (a)(3)(B); 8 U.S.C. § 1227(a)(2)(A)(i)-(iii), (B), (C), (D); 8 U.S.C. § 1227(a)(3)(B).

9

of detention is limited. As to the first point, the Government's position is akin to an argument that a criminal defendant presumed innocent of a crime can relieve himself of the burden of an unconstitutional pretrial detention by pleading guilty and subjecting himself to post-trial imprisonment. Mr. Garcia claims he is not removable from the United States and that he has a right to be present here. As to the second, the detention to which Mr. Garcia has been subject can hardly be characterized as "limited" as a matter of fact or law. He has been held in detention at the Orange County Correctional Facility for four months. During that period, he has been deprived of the ability to see his daughter.[7]

As a matter of law, there is compelling authority that "[t]here is no 'static test' to determine whether a deprivation is sufficiently serious." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (addressing claims of unconstitutional conditions of confinement under the Eighth and Fourteenth Amendments). Even persons who are *found* by judicial officers probably to have committed serious crimes are entitled to a "prompt" hearing at which the Government bears the burden before they may be held in detention. *Cty. of Riverside*, 500 U.S. at 52; *Gerstein v. Pugh*, 420 U.S. 103, 125 (1975). Thus, in *Cty. of Riverside*, after noting that "prolonged detention based on incorrect or unfounded suspicion may unjustly imperil [a] suspect's job, interrupt his source of income, and impair his family relationships," 500 U.S. at 52 (quotation

---

[7] Indeed, the Government's unconstitutional detention of Mr. Garcia assumes additional weight when one considers that he is the parent of a young child. "It is established that parents have a fundamental, constitutionally protected liberty interest in the custody of their children." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citing *Stanley v. Illinois*, 405 U.S. 645, 651–52 (1972)). Courts are instructed to tread on this relationship only with the utmost care. *See, e.g.*, *United States v. Myers*, 426 F.3d 117, 130 (2d Cir. 2005) (requiring district courts to consider four questions before imposing a supervised release condition that restricts contact with a defendant's child). This precaution not only respects the constitutional right to parent but also protects the child, and the parent-child relationship, from often devastating consequences of broken attachment. *See* Anna T. Smyke, Ph.D. et. al., *Mental Health Implications for Children of Incarcerated Parents*, 63 Loy. L. Rev. 405, 410 (2017) ("In early childhood, young children are not able to sustain meaningful attachments to adult caregivers without having substantial amounts of regular contact with them . . . . Disrupting attachment relationships . . . poses significant risks to young children.").

10

omitted), the Supreme Court held that a person arrested on suspicion of having committed a crime is entitled to a judicial probable cause determination—at which the burden is on the government and bail is set—within 48 hours, the time necessary for the government to deal with "paperwork and logistical problems" and "the everyday problems of processing suspects through an overly burdened criminal justice system." *Id.* at 55. If the person is not given such a hearing within that time period, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57.

In the context of aliens who are subject to a final order of deportation and are in the process of being removed, the Supreme Court has held that the constitutionally maximum period is generally six months. *Zadvydas*, 533 U.S. at 701. That time is the "period reasonably necessary [for the Government] to secure removal." *Id.* at 700. If, after that time period, the alien is not removed, the burden shifts to the Government to "respond with evidence" supporting continued detention as long as the detainee provides good reason to believe there is no significant likelihood of removal in the future. *Id.* at 701. And that is for a person found in a final order to be removable—not, as here, a person only suspected of being unlawfully present in the United States and thus removable. The determination of whether detention is limited is not just based (as the Government would have it) on a calculation of days, but also on whether that detention is longer than reasonably necessary to achieve the Government's legitimate and lawful purposes. In the case of a bond hearing, that time is the time necessary to arrange for and have the hearing. *See Zadvydas*, 533 U.S. at 699 (courts should measure constitutionality of detention "primarily in terms of the statute's basic purpose").

Here, Mr. Garcia has neither been found likely to be a criminal nor does he have any prior criminal convictions. There is no quarrel among the parties that the Government may hold

11

a detainee for the limited period of time necessary for the Government to process paperwork and evidence (already in its possession) to show that the detainee presents a risk of flight or a danger to the community.  Even acknowledging the deference owed the Government in the area of immigration, *see Flores*, 507 U.S. at 305, it follows from the logic of *Salerno*, *Zadvydas*, and *Cty. of Riverside* that if the Government seeks to hold a person not suspected of being a criminal and not removable because of a prior "extremely serious offense"[8] until the end of removable proceedings, it must within some reasonable period afford the person a hearing and bear the burden to demonstrate the need for continued detention.

### 3. Exhaustion of Administrative Remedies

Finally, the Court rejects the Government's argument that it should decline to hear this case because Mr. Garcia failed to "exhaust" his administrative remedies.  Specifically, the Government argues that Mr. Garcia could have challenged the Immigration Judge's bail determination by appealing to the BIA on non-constitutional grounds (including on the grounds that the Immigration Judge should have found that Mr. Garcia proved his case for bond by clear and convincing evidence).[9]  Mr. Garcia did not take such appeal, and the time to take one has now elapsed.  Therefore, the Government insists that the doors of the federal courthouse should be closed to him.  On these facts, the Court disagrees.

First, the parties agree that no federal statute requires a person in immigration detention to exhaust internal administrative remedies before filing a claim in federal court on the ground that he or she is being detained unconstitutionally.  This silence is in contrast to, for example, 28

---

[8] *Contra* Section 1226(c); *see Salerno*, 481 U.S. at 750.
[9] *See* 8 C.F.R. § 1236.1(d) (right to appeal custody determination); *see also In Re Guerra*, 24 I. & N. Dec. 37, 40–41 (BIA 2006) (BIA decision agreeing with Immigration Judge that the noncitizen "failed to meet his burden of establishing that he warrants release on bond" and listing nine factors that Immigration Judges may consider in reaching their determinations, including "whether the alien has a fixed address in the United States," "the alien's length of residence in the United States," and "the alien's employment history").

U.S.C. § 2254(b)(1), which explicitly requires exhaustion of remedies before a federal claim may be brought in federal court, and 8 U.S.C. § 1252(d), which requires exhaustion before judicial review (even habeas review) of a final order of removal until the petitioner has exhausted administrative remedies.

Second, the Court concludes that the principles of "prudential exhaustion" or "judge-made exhaustion" upon which the Government relies do not preclude the exercise of jurisdiction here. The courts have recognized that the doctrine of prudential exhaustion "may arise . . . from an administrative scheme providing for agency relief." *Howell v. I.N.S.*, 72 F.3d 288, 291 (2d Cir. 1995) (citation and internal quotations omitted). Prudential exhaustion is intended to "protect[] the authority of administrative agencies, limit[] interference in agency affairs, [permit the agencies to] develop[] the factual record to make judicial review more efficient, and [to] resolv[e] issues to render judicial review unnecessary." *Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003).[10] Both the Supreme Court and Second Circuit have instructed that courts should exercise "sound judicial discretion" in determining whether to apply the doctrine. *McCarthy v. Madigan*, 503 U.S. 140, 144 (1992), *quoted in Beharry*, 329 F.3d at 57.

---

[10] In *Beharry*, the Second Circuit determined in the alternative that it was an abuse of discretion, on the facts of that case, for the district court to have exercised jurisdiction. 329 F.3d at 53 n.1. That decision does not answer the question before this Court. The petitioner in *Beharry* was an aggravated felon who admitted deportability but argued on appeal that, in ordering him deported, the Immigration Judge failed to apply a statute giving the INS authority to grant certain discretionary relief from deportation. The petitioner did not raise that basis for relief before either the Immigration Judge or the BIA. *Id.* at 54. The Second Circuit determined that, on those facts, the district court should not have exercised jurisdiction. *Beharry* is distinguishable for several reasons. First, Beharry's claim arose against the backdrop of a statute, Section 106(c) of the Immigration and Naturalization Act, providing that "[a]n order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations." The Second Circuit assumed (but did not conclude) that such statute applied to habeas proceedings. Accordingly, a decision permitting petitioners such as Beharry to file habeas petitions without exhausting administrative remedies would have created a back door to Section 106(c)—effectively rendering illusory the protection from immediate judicial review the statute was plainly intended to provide. Second, and perhaps more importantly, the Second Circuit only applied the doctrine of common-law exhaustion after determining that "many of the purposes for requiring exhaustion would have been served had Beharry raised his claim below." *Id.* at 62. Among those purposes was the need to create a factual record. Beharry's "failure to raise his . . . claim in the administrative proceedings left sizeable gaps in the factual record presented . . . on appeal." *Id.* As noted below, neither that nor the other purposes of the doctrine would be served here.

13

The Government concedes that there are no Supreme Court or Second Circuit cases that would require this Court to deny relief, based on failure to exhaust, to a detainee who claims that an Immigration Judge has unconstitutionally placed the burden on him to establish his right to freedom. To be sure, some Southern District of New York courts have used the language of prudential administrative exhaustion in the context of Section 2241 challenges to the burden allocation in bond cases. But the vast majority of those cases have done so in an exercise of judicial discretion to defer ruling on a difficult constitutional question where a petitioner was pursuing an ongoing BIA appeal that could grant ultimate relief, or where such an appeal was still available. *See Paz Nativi v. Shanahan*, 2017 WL 281751, at *2 (S.D.N.Y. Jan. 23, 2017) ("Numerous cases in this District have applied this prudential exhaustion requirement to defer decision on habeas petitions *where a BIA appeal of a bond determination is pending*.") (emphasis added); *see also Torres v. Decker*, 2018 WL 6649609, at *2 (S.D.N.Y. Dec. 19, 2018) (noting that "petitioner's appeal of an adverse bond determination [was] pending before the BIA"); *Dembele v. Decker*, 2018 WL 4960234, at *2 (S.D.N.Y. Oct. 9, 2018) (BIA appeal pending); *Gaitan v. Decker*, 2018 WL 740996, at *1 (S.D.N.Y. Feb. 7, 2018) (same). With rare exceptions, courts have not refused relief to a petitioner who was no longer able to pursue administrative relief. *Cf. Paz Nativi*, 2017 WL 281751, at *2 ("The pendency of a BIA appeal that could potentially moot Paz Nativi's habeas petition counsels for the Court to stay its hand until the exhaustion of administrative review in the name of preserving scarce judicial resources and avoiding the possibility of duplicative or conflicting rulings.").

So understood, the courts appear to be applying a form of judicial docket administration. *See Katz v. Cellco P'ship*, 794 F.3d 341, 346 (2d Cir. 2015) ("[D]istrict courts no doubt enjoy an inherent authority to manage their dockets.") (citing *Link v. Wabash R.R.*, 370 U.S. 626, 630–31

(1962)). Indeed, in at least some of the cases cited by the Government, the courts retained jurisdiction and merely stayed proceedings, a result entirely inconsonant with the Government's current contention that administrative remedies must be exhausted before a case can be heard under Section 2241. *See, e.g.*, *Paz Nativi*, 2017 WL 281751, at *2; *cf. Beharry*, 329 F.3d at 53 n.1 ("If . . . the exhaustion requirement is judge-made, it may or may not be jurisdictional."); Peter Devlin, Note, *Jurisdiction, Exhaustion of Administrative Remedies, and Constitutional Claims*, 93 NYU L. Rev. 1234, 1240 (2018) ("*Even though the court has jurisdiction*, and a 'virtually unflagging obligation' to exercise it, the court may still dismiss a plaintiff's claims and send him or her back to the agency to exhaust available remedies before seeking relief from federal court.") (emphasis added) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

Applying the same standards as those cases and the others that the Government cites, it is apparent that the Court should not decline to exercise jurisdiction here. Mr. Garcia has an immediate, ripe constitutional claim. He contends his continued detention without any showing by the Government that he is a flight risk or danger to the community violates his Due Process rights. His constitutional claim is substantial. As noted above, every court in this jurisdiction to have considered the issue has recognized it. To reiterate, "[f]reedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that [the Due Process] Clause protects." *Zadvydas*, 533 U.S. at 690; *see also Able v. United States*, 88 F.3d 1280, 1289 (2d Cir. 1996) (exhaustion not required where "substantial constitutional question" was presented, claimant's First Amendment rights were being infringed, the challenge did not "necessitate significant fact-finding," and there was "no realistic

15

possibility" of relief because the appellate administrative bodies did not have power to declare the statute unconstitutional).

Mr. Garcia's claim does not depend on the interpretation of a law that the immigration agencies are charged with administering. Instead, Mr. Garcia is asking the Court to interpret the Constitution in order to determine whether his detention is unconstitutional. There is no alternative administrative remedy that he has or can avail himself of, and the claim would not benefit from further fact-finding. Simply, there is no administrative proceeding on which to wait. If this Court does not hear his claim, no one will.[11] *See Howell*, 72 F.3d 288 (applying administrative exhaustion to denial of application for adjustment of status after deportation proceedings had commenced because the plaintiff had the "opportunity . . . to renew her application for adjustment of status before an immigration judge," the right to relief was discretionary, irreparable injury would not occur, the plaintiff was challenging the application of a statute the INS was charged with enforcing).

In the alternative, even if the Court were required to apply the doctrine of administrative exhaustion, the Court would conclude that the failure to pursue administrative remedies is excused. "[T]he '[c]ommon law (or judicial) exhaustion doctrine . . . recognizes judicial discretion to employ a broad array of exceptions that allow a plaintiff to bring his case in district court despite his abandonment of the administrative review process.'" *Theodoropoulos v. I.N.S.*, 358 F.3d 162, 172 (2d Cir. 2004) (quoting *Beharry*, 329 F.3d at 58). Here, several exceptions exist. As in *Able*, 88 F.3d 1280, and unlike in *Howell*, 72 F.3d 288, Mr. Garcia has raised a significant constitutional question and has alleged irreparable injury: the continued deprivation

---

[11] Nothing in this opinion be read to suggest that, in a different case, where a petitioner was pursuing an ongoing BIA appeal or where such an appeal was available, the Court could not stay the case until the administrative process was compete—in the exercise of its inherent power to manage its own calendar. The courts have that power. *See Katz*, 794 F.3d at 346.

16

of his liberty and his separation from his young child. Mr. Garcia's appeal also would have been futile. As the Government admits, the BIA is without power to address the core of Mr. Garcia's claim—his constitutional claim. *See United States v. Gonzalez-Roque*, 301 F.3d 39, 48 (2d Cir. 2002) ("[T]he BIA does not have jurisdiction to adjudicate constitutional issues.") (citation omitted). Mr. Garcia claims that he, like any other person in the United States protected by the Due Process Clause, cannot be held in lengthy detention without the Government "convinc[ing] a neutral decisionmaker by clear and convincing evidence [that detention is necessary to ensure safety of the community]." *Salerno*, 481 U.S. at 755.

It is no answer to say that Mr. Garcia could have appealed to the BIA. As the Government conceded in its briefing and at oral argument, the BIA—just like the Immigration Judge—would have relieved the Government of any burden to show that Mr. Garcia poses a risk of flight or a danger to the community.[12] All an appeal would have done would have been to force Mr. Garcia to be detained longer.[13] His interest, an interest in his liberty, is just as substantial and the affront to it just as irreparable as the interest and the injury to First Amendment rights in *Able*. 88 F.3d at 1288–89. Finally, at present, Mr. Garcia has no administrative appeal available to him. To require him to take an appeal now would be futile.[14]

---

[12] The Government's briefing asserts that the BIA has "consistently reaffirmed that the burden should be placed on the alien." *See Matter of Siniauskas*, 27 I. & N. Dec. 207, 207 (BIA 2018); *Matter of Fatahi*, 26 I. & N. Dec. 791, 793 (BIA 2016); *Matter of Guerra*, 24 I. & N. Dec. 37, 39 (BIA 2006).

[13] According to the uncontroverted declaration of the Attorney-in-Charge of the New York Immigrant Family Unity Project at Brooklyn Defender Services, the average length of detained bond appeals to the BIA is between 4 and 6 months, but it can "exceed 8 months or longer."

[14] Ultimately, the Government asks the Court to take a position that the Court believes is untenable and is contrary to law. That is so whether the Court views judicial administrative exhaustion as a form of judicial docket management that it declines, in its discretion, to apply or whether the doctrine is applicable but subject to a futility exception. The Government's position would require an immigration detainee who lacks any meritorious non-constitutional claim but who has a strong constitutional claim (even one based on settled law) to pursue that futile claim at great cost and delay, and with efficiency costs to the agency, before presenting the winning constitutional claim to a court. And it would close the courthouse doors to an immigration detainee who, instead of pursuing that meritless claim, sought relief from the Great Writ for his ongoing unconstitutional custody. The parties have not cited a case to support that result.

Lastly, the Court rejects the Government's suggestion that hearing Mr. Garcia's petition will incentivize other immigration detainees to bypass administrative appeals and run to federal court. As the Government presses in its briefing, an immigration detainee can receive "a genuine opportunity for relief" from the BIA, on grounds that are "entirely distinct" from the kind of constitutional claim asserted here. The BIA will entertain any number of non-constitutional arguments to continued detention, including "factfinding, factor-balancing, and exercise of discretion." *Rosario v. Holder*, 627 F.3d 58, 61 (2d Cir. 2010). Those arguments are not available in federal court. *Id.* ("[W]e lack jurisdiction to review them."). There is no reason to believe that large numbers of detainees will sacrifice the chance to make those arguments if this Court hears Mr. Garcia's claim now.[15]

## CONCLUSION

For the reasons stated herein and on the record on March 13, 2020, the petition for a writ of habeas corpus is GRANTED.

SO ORDERED.

Dated: March 24, 2020
      New York, New York

LEWIS J. LIMAN
United States District Judge

---

[15] If either the Second Circuit or the Supreme Court holds that the Constitution requires the burden of proof to rest on the Government, but an Immigration Judge misallocates the burden, this Court expects that immigration detainees will immediately go to federal court and will not wait until after a BIA appeal is complete. If that happens, it will result from Immigration Judges flouting the law (which this Court has no reason to expect) and not anything the Court decides today.